# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 22-cr-11-5 (RJL)** |
| **v.** | : | |
| | : | |
| **JAMES BRETT IV,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>UNITED STATES' TRIAL BRIEF</u>

The United States respectfully submits this trial brief in advance of the November 14, 2024, trial in the above-captioned matter. The brief provides **(i)** a summary of the defendant's conduct that will support the charged offenses, **(ii)** a summary of the charges and elements, **(iii)** a summary of the anticipated government witnesses' testimony, and **(iv)** a discussion of certain evidentiary issues anticipated to arise.

## I. THE DEFENDANT'S ROLE IN THE JANUARY 6, 2021 RIOT AT THE U.S. CAPITOL

The Court is familiar with the riot at the U.S. Capitol on January 6, 2021, which interrupted the certification of the 2020 presidential election. The evidence at trial will show that the defendant, James Brett IV, a member of the Proud Boys,[1] contributed to the riot by joining the mob that stormed the Capitol. Brett, often in concerted action with others, obstructed, impeded, and interfered with police as he battled officers, including those protecting the Lower West Terrace Tunnel.

---

[1] In Section III-D, as well as in the government's motion in limine, the government describes the extent of the Proud Boy evidence it plans to present at trial and how the government plans to admit said evidence.

On the morning of January 6, Brett joined a group of approximately 100 other Proud Boys who were instructed to congregate by the Washington Monument at 10:00 a.m. Around 10:30 a.m., the leaders of the group organized the Proud Boys into formation and marched them away from the planned rally at the Ellipse and directly toward the Capitol. Brett marched at the front of the group with members of his Proud Boys "chapter"—including his former co-defendants Alan Fischer III, Brian Boele, Zachary Johnson, and Dion Rajewski—as shown below. As the group marched, Joseph Biggs rallied the crowd urging "So let's go fucking kick some goddamn ass! Metaphorically speaking but you know what I mean, ya." Government Exhibit 405A at 7:25.



*Government Exhibit 404 at 1:59 elapsed (Brett circled in yellow)*

By 11:20 a.m., Brett reached the west front of the Capitol on First Street NW with the group, passing obvious "AREA CLOSED" signs posted on metal barriers and snow fencing, as pictured below. As Brett stood within earshot, one of the Proud Boys leaders, Ethan Nordean, used the megaphone to announce, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution against

foreign enemies and domestic. Let us remind those who have forgotten what that means."



*Government Exhibit 408C (Brett circled in yellow and "AREA CLOSED" signs in background)*

At approximately 11:28 a.m., as the group marched past U.S. Capitol Police officers, some of the men marching in the group taunted them, yelling "treason," and warning the officers, "don't make us go against you." A few minutes later, Brett and the group made their way around to the east side of the Capitol, passing additional metal barricades and police vehicles. Nordean again used the megaphone to say, "And don't forget we don't owe you anything. We don't owe you anything. Your job is to protect and serve the people, not property or bureaucrats." Shortly after 12:00 p.m., Brett marched with the Proud Boys to a group of food trucks located near 2nd Street and Constitution Avenue NW. There, the group stopped and waited for approximately the next thirty minutes before marching toward the Capitol once again.

Around 12:50 p.m., Brett and the other Proud Boys arrived at the west side of the Capitol near Peace Circle, where a series of barricades, adorned with "AREA CLOSED" signs, designated the outer restricted area. Additional barricades and snow fencing, also fixed with "AREA

CLOSED" signs, were situated within the inner restricted area on the west Capitol grounds. Shortly after the Proud Boys arrived at approximately 12:52 p.m., the first breach of the restricted area on January 6 occurred at Peace Circle. Several rioters jumped over and pushed down the unmanned barricades at Peace Circle, allowing the mob to advance into the restricted area and engage with U.S. Capitol Police officers reestablishing a line behind the inner additional metal barricades with "AREA CLOSED" signs on the Pennsylvania Walkway. Less than a minute later, rioters overran that police line and toppled barricades, allowing the mob and Brett to surge forward. From there, Brett and his former co-defendants charged down the left side of the Pennsylvania Walkway, as shown below, making his way to the front of the mob assembling on the Lower West Plaza of the Capitol. Brett was among the first group of rioters to enter the restricted grounds and storm the Capitol that day.



*Government Exhibit 413A at 2:11 elapsed (Brett, circled in yellow, running down the Pennsylvania Walkway seconds after the Peace Circle breach)*

By approximately 12:58 p.m., Brett reached a permanent metal barricade guarded by U.S. Capitol Police officers reestablishing a line on the Lower West Plaza, as pictured below. Seconds later, as the mob grew increasingly hostile, rioters pushed on the barricade until it gave way. Brett contributed to this push initially before backing away. He then jumped over the toppled barricade before helping others climb over and proceeding further into the restricted area.



*Government Exhibit 415 at 6:44 elapsed (Brett, circled in yellow, seconds before rioters toppled the metal barricade)*

From there, Brett advanced with the mob to the base of the inaugural dtage, located on the Upper West Plaza where, for approximately the next 90 minutes, police officers and rioters clashed with fists, batons, projectiles, pepper spray, tear gas, and wide variety of other makeshift weapons brought by the mob or seized from the inaugural stage construction site. Due to the dire situation facing Capitol Police, requested all available law enforcement respond. Metropolitan Police Department (MPD) answered the call for back-up, and began arriving, in waves, on the west grounds around 1:00 p.m.

Despite the chaos and the size of the crowd, Brett remained in close contact with his fellow Proud Boys and former co-defendants. For example, just before 1:05 p.m., Brett and his former co-defendants stood feet away as rioters attacked the police line. A large scuffle between police and rioters ensued and tear gas was deployed in Brett's vicinity. A few minutes later, around 1:12 p.m., the police deployed chemical spray to reestablish a defensive line, pushing Brett and his former co-defendant Rajewski back onto the Lower West Plaza. Brett subsequently watched as another rioter launched a piece of broken fencing as a projectile at the police line.



*Government Exhibit 420 at 1:57 elapsed (Brett, circled in yellow, moments before rioters attacked police)*



*Government Exhibit 441 at 1:23 elapsed (Brett, circled in yellow, moving away from the police line)*

By 2:28 p.m., rioters on the West Plaza overran the police line and the police fell back to an area known as the Lower West Terrace Tunnel (the "Tunnel"), which led directly inside the Capitol building. On a normal day, the Tunnel consists of a flight of stairs leading to an entrance of the Capitol. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a Tunnel that was approximately ten feet wide and fifteen feet long. The Tunnel led to two sets of internal glass doors and a security screening area in the basement of the Capitol building. After the police perimeter was breached on the West Plaza of the Capitol, a number of officers retreated into the Tunnel to regroup. Rioters streamed up, over, and through the inaugural stage, following officers into the Tunnel in large numbers. There they began to fight the police in an attempt to enter the Capitol. A group of officers, using their bodies to barricade the entrance, constituted the only barrier between the rioters in the Tunnel and entry into the Capitol building. Some of the most violent assaults on law enforcement officers on January 6, 2021, occurred in the Tunnel.

Just before 3:16 p.m., Brett and his former co-defendants entered the Tunnel and joined the fight against police. Upon entering the Tunnel, Brett and his former co-defendants momentarily stopped, turned, and conferenced with each other, making sure their masks and hoods were affixed, before returning their attention to the Tunnel. As the others were still conferencing, Brett grabbed the back of another rioter and followed him closer to the police line where Brett was the first of his co-defendants to start pushing against the police line. At one point, Brett gave the finger and yelled "fuck you," before he resumed pushing. For the next several minutes, rioters in the Tunnel, including Brett and his former co-defendants, pushed against the officers, by rocking their bodies back and forth in unison, trying to use their collective force to break through the police line and enter the Capitol. This effort, known as the "heave ho" effort due to rioters' chants during their concerted pushes, resulted in immense physical force and pressure being placed upon the officers in the Tunnel, interfering with the performance of their official duties.



*Government Exhibit at 307 at 3:15:57PM (Brett, circled in yellow, entering the Tunnel)*



*Government Exhibit 307 at 3:16:13PM (Brett, circled in yellow, giving the finger)*

Beginning around 3:18 p.m., the officers made a concerted effort to retake the Tunnel, pushing the rioters, including Brett, toward the exit and forcing them out of the Tunnel. But Brett did not leave willingly and remained on the stairs, near the mouth of the Tunnel, for about a minute until an officer pushed him away from the Tunnel. From there, Brett descended the stairs outside the Tunnel, passing within a few feet of Metropolitan Police Department Officer Michael Fanone, who had been dragged out of the Tunnel by other rioters and viciously assaulted. A Capitol Police Officer, Officer Moore, was also dragged out into the crowd at the same time as MPD Officer Fanone. Brett departed from the area around the Tunnel shortly thereafter.



*Government Exhibit 452 at 5:23 elapsed (Brett, circled in yellow, descending the stairs outside the Tunnel)*

## II.    THE CHARGES AND LEGAL ELEMENTS

For his part in the riot, a grand jury charged Brett in a Second Superseding Indictment with the following offenses: civil disorder in violation of 18 U.S.C. § 231(a)(3) and 2 (Count 1); entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) and 2 (Count 7); disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) and 2 (Count 11); and disorderly conduct in the capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D) and 2 (Count 14). *See* ECF No. 45.

### A.    Count One, Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3) and 2[2]

Count One of the Indictment charges the defendant with obstructing, impeding, or interfering with law enforcement officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3) and aiding and abetting. To find the defendant guilty of this offense, the Court must find

---

[2] For the definition of Aiding and Abetting, in each Count, the government refers the Court to 18 U.S.C. § 2(a); Third Circuit Model Jury Instructions 7.02. *See United States v. Fellows*, 21-cr-83 (TNM) (ECF No. 140 at 29-31); *United States v. McAbee*, 21-cr-35 (RC) (ECF No. 376, at 21-25).

that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2. Second, at the time of the defendant's actual or attempted act, the law enforcement officer was engaged in the lawful performance of his official duties incident to and during a civil disorder.

3. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.[3]

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia. It also means commerce wholly within the District of Columbia.[4]

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.[5]

The term "law enforcement officer" means any officer or employee of the United States or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States or the District of Columbia.[6]

---

[3] *See* 18 U.S.C. § 232(1).

[4] *See* 18 U.S.C. § 232(2).

[5] *See* 18 U.S.C. § 232(3).

[6] *See* 18 U.S.C. § 232(7).

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did, said, or perceived.[7]

### B.  Count Seven, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. §§ 1752(a)(1) and 2

Count Seven of the Indictment charges the defendant with entering or remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and aiding and abetting. To find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so; and

2.  Second, the defendant did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.[8]

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.[9]

The term "knowingly" has the same meaning described in the instructions for Count One.

---

[7] *See* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit §§ 1512 & 1515(a)(1); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005); *United States v. Gunby*, 21-cr-626 (PLF) (ECF No. 57 at 7) (holding, in a January 6 case charging offenses under 18 U.S.C. § 1752 and 40 U.S.C. § 5104, that "what [the defendant] witnessed is directly relevant to his knowledge and intent") (citing *United States v. Griffith*, 21-cr-244, 2023 WL 2043223, at *3 (D.D.C. Feb. 16, 2023) and *United States v. Rhine*, 21-cr-687, 2023 WL 2072450, at *7 (D.D.C. Feb. 17, 2023));

[8] *See* 18 U.S.C. § 1752(c)(1).

[9] *See* 18 U.S.C. § 1752(c)(2) (citing to 18 U.S.C. § 3056)).

### C. Count Eleven, Disorderly or Disruptive Conduct in a Restricted Area, 18 U.S.C. § 1752(a)(2) and 2

Count Eleven of the Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2) and aiding and abetting. To find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant knowingly engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2. Second, the defendant did so with the intent to impede or disrupt the orderly conduct of Government business or official functions..

3. Third, the defendant's conduct occurred when, or so that, her conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" is conduct that, when viewed in the circumstances in which it takes place, is likely to endanger public safety or create a public disturbance.[10] Even passive, quiet, and nonviolent conduct can be "disorderly," if the conduct is likely to cause a public disturbance.[11] Disorderly conduct includes when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken, uses words likely to produce violence on the part of others, or is unreasonably loud and disruptive under the circumstances.[12]

"Disruptive conduct" that, when viewed in the circumstances in which it takes place, tends

---

[10] *See United States v. Alford*, 89 F.4th 943, 950 (D.C. Cir. 2024).

[11] *See Alford*, 89 F.4th at 950 ("[I]it is … clear from caselaw that even passive, quiet and nonviolent conduct can be disorderly. The Supreme Court has recognized that a breach of the peace can occur 'by passive conduct likely to cause a public disturbance'").

[12] *United States v. Schwartz, et al.*, No. 21-cr-178 (APM), ECF No. 172 at 27; *United States v. Gietzen*, No. 22-cr-116 (CJN), ECF No. 50 at 32; *United States v. Alam*, No. 21-cr-190 (DLF), ECF No. 104 at 237-38.

to interfere with or inhibit usual proceedings.[13] This includes conduct that causes disorder or turmoil, or that stops or prevents the normal continuance of an activity. Whether particular conduct is "disruptive" depends on the context and surrounding circumstances, and includes conduct that is plainly out of place for the time or setting where it occurs.[14]

The term "knowingly" has the same meaning described in the instructions for Count One.

The phrase "restricted building or grounds" has the same meaning described in the instructions for Count Five.

### D. Count Fourteen, Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D) and 2

Count Fourteen of the Indictment charges the defendant with disorderly and disruptive conduct within in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) and aiding and abetting. To find the defendant guilty of this offense, the Court find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant engaged in disorderly or disruptive conduct within the United States Capitol Grounds or in any of the United States Capitol Buildings.

2. Second, the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

3. Third, the defendant acted willfully and knowingly.

The term "United States Capitol Building" includes the United States Capitol located First Street Southeast, in Washington, D.C. The term "United States Capitol Grounds" are defined by the United States Code, which refers to a 1946 map on file in the Office of the Surveyor of the District of Columbia. The boundaries of the Capitol Grounds include all additions added by law

---

[13] *See Alford*, 89 F.4th at 951.

[14] *See Alford*, 89 F.4th at 950-51 (noting that "disrupt" means "to throw into disorder or turmoil" and that "disruptive actions are those that are inappropriate or plainly out of place for the time or setting").

after that map was recorded. The Capitol Grounds includes the portion of Pennsylvania Avenue Northwest from the west curb of First Street Northwest to the curb of Third Street Northwest.

A person acts "willfully" if she acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  In other words, to find that the defendant acted "willfully," you must find that the evidence proved beyond a reasonable doubt that she acted with a purpose to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that her conduct may be violating.[15]

The terms "knowingly," "disruptive conduct," and "disorderly conduct" have the same meanings as described in the instructions for Counts One and Ten.

For purposes of this offense, "the orderly conduct of a session of Congress or either House of Congress" includes the actions of the Joint Session of Congress convened on January 6, 2021, to certify the Electoral College vote of 2020.[16]

## III.    TRIAL TESTIMONY

### A.  Inspector Lanelle Hawa

United States Secret Service Inspector Lanelle Hawa was present at the U.S. Capitol on January 6, 2021. At that time, she was assigned to the Liaison Division of the Secret Service. Inspector Hawa will testify about the security measures that were in place to protect the Vice President, who was at the Capitol to preside over the Joint Session of Congress convened to certify the votes of the Electoral College, including working with the USCP to establish a restricted area. Based on her personal knowledge, Inspector Hawa will also testify about **(i)** the various security breaches that occurred at the Capitol on January 6, **(ii)** how, generally, the Vice President and his

---

[15] *See United States v. Bryan*, 524 U.S. 184, 190 (1998).

[16] *See United States v. Kelly*, No. 21-cr-708 (RCL), ECF No. 101 at 17.

family were evacuated from the Senate Chamber[17], **(iii)** how the riot made it more difficult for the Secret Service to perform the federally protected function: protecting the Vice President and his family; and **(iv)** how the Vice President and Congress could not safely resume the certification process until every single rioter was cleared from the Capitol building and grounds.

### B.  Inspector Carneysha Mendoza

Inspector Carneysha ("Neysha") Mendoza of the U.S. Capitol Police was on duty and present at the Capitol on January 6, 2021. Inspector Mendoza will provide an overview of the U.S. Capitol building and grounds and explain how the building and grounds were protected and then overrun by rioters on January 6, 2021. Inspector Mendoza will also provide an overview of the civil disorder and how it disrupted of the Joint Session of Congress and obstructed law enforcement. Finally, Inspector Mendoza will authenticate video footage, including U.S. Capitol Police CCTV surveillance footage, documenting what occurred what occurred at the Capitol on January 6, 2021.

### C.  Officer Henry Foulds

Metropolitan Police Department Officer Henry Foulds was on duty as a member of Civil Disturbance Unit 74 on January 6, 2021. Officer Foulds' unit received a 10-33 call from the Capitol, meaning that officers were in distress and needed assistance. Officer Foulds and his unit responded to the Capitol and defended the west front in the face of an increasingly hostile and confrontational mob. Officer Foulds will then testify to his experience defending the Capitol in the Lower West Terrace Tunnel. Officer Foulds was in the Tunnel at the same time as, and in close proximity to, Brett and his former co-defendants. Officer Foulds will testify to the effects of being constantly pushed by rioters, including Brett, and how the rioters, including Brett, made it more

---

[17] The government has moved, in limine, to limit cross examination into the specific security protocol of the USSS.

difficult for him to do his job on January 6, 2021.

### D.  Task Force Officer Shawn Walsh

The government will present testimony from FBI Task Force Officer ("TFO") Shawn Walsh who conducted the FBI's investigation of Brett. TFO Walsh's testimony will include the investigation's origins, progress, and the identification of Brett-all which involve Brett's affiliation with the Proud Boys. This testimony will include brief background on the Proud Boys organization and their structure, including the regional group, Trigger City, to which Brett belonged. The anticipated testimony will also cover Brett's December 2021 visit to D.C. with the Proud Boys.[18]

TFO Walsh's testimony with also cover his review of U.S. Capitol Police CCTV surveillance footage, officer body-worn camera footage, and other video footage from January 6, 2021 which will put into context Brett's movements and conduct at the Capitol on January 6, especially when he is working alongside his former co-defendants. TFO Walsh will also testify as to certain items recovered Brett's residence including Proud Boy clothing.

Finally, though the government intends to admit, as evidence of the riot's impact on commerce, the self-authenticating Safeway business records via Federal Rule of Evidence 803(6) and 902(11), TFO Walsh will also be available to testify about Safeway's records from January 6, 2021, if needed.

## IV.    EVIDENTIARY ISSUES

The government will present much of its evidence through video that captured Brett's conduct at the Capitol on January 6, 2021. In addition to U.S. Capitol Police CCTV surveillance footage, the government will seek to introduce open-source video footage taken by photojournalists and others on that day. To authenticate those videos, the government will employ

---

[18] The government had laid out, in greater detail, the anticipated evidence related to the Proud Boy's in its motion in lime.

a combination of the following methods, each of which is independently sufficient for purposes of Federal Rule of Evidence 901:

1. A certification under Federal Rule of Evidence 902(11) by the person/journalist who filmed and posted the video attesting to its authenticity;

2. Testimony from police officers establishing that the events depicted in the video match their recollection of events they perceived on January 6, 2021, and the officers can identify themselves in the video; and

3. A comparison between the video footage and contemporaneous U.S. Capitol Police CCTV footage and other footage captured at the U.S. Capitol showing overlapping events and people.

These methods are more than adequate to satisfy Rule 901. For authentication purposes, the proponent of the evidence need only satisfy the court that there is sufficient evidence "to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "[A]uthentication may be achieved through 'the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *United States v. Kilpatrick*, No. 10-20403, 2012 WL 3236727, at *4 (E.D. Mich. Aug. 7, 2012), *aff'd*, 798 F.3d 365, 383 (6th Cir. 2015) (quoting Fed. R. Evid. 901(b)(4)).

As has been noted by many courts, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992); *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the

proponent's burden of proof for authentication is slight") (citation and quotation marks omitted).

To make a *prima facie* showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981); *see United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) ("Authentication may be established 'solely through the use of circumstantial evidence.'"). The government need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) ((quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)).

Courts have routinely rejected overbroad, unsupported authenticity challenges. *See, e.g.*, *Asociacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 79 (1st Cir. 2021) (rejecting authenticity challenge where plaintiffs characterized video as "incomplete" and "extensively edited," but "make no claim of (or offer any reason to suspect) fraud or tampering, nor do they say that the videos do no show actual footage of the incident in question"); *United States v. Washington*, No. 16-cr-477, 2017 WL 3642112, at *2 (N.D. Ill. Aug. 24, 2017) (holding that a video downloaded from YouTube was properly authenticated and noting that the defendant did "not argue or provide reasons why the Court should think that it is not him in the video or that the video is fake," and rejecting defendant's argument that the government could not authenticate the video because it did not know "whether the video was altered after filming"). The defendant remains free to argue that evidence has been altered. But questions concerning possible alterations go to the weight the factfinder should give the evidence, not to its authenticity. *See United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006) (finding that arguments that earlier emails

included in an email chain may have been altered). And courts have also held that a party's "failure to offer any rebuttal to authenticity bolsters admission." *Nester v. Textron, Inc.*, 888 F.3d 151, 161 (5th Cir. 2018) (citing cases).

The government provides the following non-exhaustive examples of open-source footage that can be authenticated by comparison of distinctive characteristics in other reliable footage:

### A.  Government Exhibit 408

Government Exhibit 408 is a third-party video of the Proud Boys, including Brett, marching earlier in the day on First Street NW in front of the Capitol. The footage may be authenticated by comparison to U.S. Capitol Police CCTV surveillance video, both which show the Proud Boys reaching a crosswalk (circled in yellow) near two large trees (circled in red) and line of white "AREA CLOSED" signs attached to fencing (circled in orange), as pictured below.



*Government Exhibit 408C*



*Government Exhibit 303 at 11:21:32AM*

### B. Government Exhibit 413

Government Exhibit 413 is another third-party video depicting the breach of Peace Circle and Brett running up the left side of the Pennsylvania Walkway towards the west front of the Capitol. This exhibit may be authenticated by comparison to U.S. Capitol CCTV surveillance footage. The screenshots below show several identical characteristics, including, among other things, **(i)** Brett in his grey-hooded sweatshirt (circled in yellow); **(ii)** Brett's former co-defendant, Zachary Johnson, running directly behind Brett (circled in red); **(iii)** the two lampposts adjoining the walkway (circled in orange); **(iv)** the red, white, and blue flag (circled in green); and **(v)** the tree with no leaves in front of Brett (circled in purple).



*Government Exhibit 413A at 2:11 elapsed*



*Government Exhibit 303 at 12:55:30PM*

### C.  Government Exhibit 415

Government Exhibit 415 is a third-party video depicting the breach of Peace Circle and

Brett at the front of a permanent metal barricade guarded by U.S. Capitol Police officers on the

Lower West Plaza. As described above, the mob grew increasing hostile and pushed on the barricade until it gave way. Brett contributed to this push initially before backing away. He then jumped over the toppled barricade before helping others climb over and proceeding further into the restricted area. The footage may be authenticated by comparison to U.S. Capitol Police CCTV surveillance video, both which show Brett (circled in yellow) directly next to a blue flag (circled in red) near a black metal fence with a cement wall (circled in orange), as indicated below. Both videos also show rioters breaching the police line seconds later further confirming that the videos are authentic and accurate.



*Government Exhibit 415 at 6:44 elapsed*



*Government Exhibit 302 at 12:58:32 P.M.*

### D.  Government Exhibit 453

Government Exhibit 453 is video footage taken by a photojournalist on January 6, 2021. It depicts Brett inside the Lower West Terrace Tunnel pushing against the police line. Although the government plans to authenticate this footage through percipient witness's testimony, the footage may be authenticated by comparison to U.S. Capitol Police CCTV surveillance video. The screenshots below show several identical characteristics, including, among other things, **(i)** an American flag (yellow circle); **(ii)** a microphone muff (red circle); **(iii)** a phone attached to a tripod (orange circle); **(iv)** a rioter with a pink gas mask (pink circle); and **(v)** a rioter holding his phone above his head (green circle).



*Government Exhibit 453 at 25:54 elapsed*



*Government Exhibit 307A at 3:17:05PM*

## V.    CONCLUSION

The defendant was aggressive, violent, and an active participant in the riot at the U.S. Capitol on January 6, 2021. Acting together and with others around him, Brett obstructed, impeded, and interfered with police. At trial, the evidence will prove beyond a reasonable doubt that the defendant committed each offense charged in the Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Jake E. Struebing*
JAKE E. STRUEBING
Assistant U.S. Attorney
D.C. Bar No. 1673297
U.S. Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6931
Jake.Struebing@usdoj.gov

*/s/ Rebekah E. Lederer*
REBEKAH E. LEDERER
Assistant U.S. Attorney
Pennsylvania State Bar No. 320922
U.S. Attorney's Office for the
District of Columbia
601 D St., NW
Washington, D.C. 20530
(202) 252-7012
rebekah.lederer@usdoj.gov